IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JONES EXPRESS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:10-cv-140 |
| | ) | |
| ERNEST WATSON, | ) | Judge Thomas A. Wiseman, Jr. |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

Plaintiff Jones Express seeks damages for breach of contract.  Based on all the proof before the Court, the Court finds that Jones Express, though entitled to a judgment of liability in its favor, is not entitled to recover the full amount of the damages it seeks.  For the reasons set forth herein, judgment will enter in favor of Jones Express in the amount of $500.00.

**I.      BACKGROUND**

Jones Express brought suit for breach of contract against Ernest Watson in 2010, alleging that Watson had violated an indemnification provision contained in a lease executed by the parties in 2007.  Alternatively, Jones Express claimed that Watson had breached a common-law duty to indemnify.  The complaint sought damages for breach of contract "far in excess of $75,000" (Compl. (ECF No. 1) at ¶ 9), but did not state the precise amount of Jones Express's damages, although it has become clear that Jones Express knew even then exactly what its damages were.

Jones Express later sought partial summary judgment in its favor solely on the issue of liability, on the basis of both contractual and common-law indemnity.  Again, Jones Express did not present any evidence as to the amount of its damages, as it sought judgment on liability only.  Ernest Watson denied liability, asserting that because Jones Express represented in the lease that it had liability insurance, the plaintiff was estopped from seeking indemnification under the indemnification provision of the lease, and that the indemnification provision and the insurance provision, read together, presented an ambiguity that could not be resolved on summary judgment.  Watson also argued that the indemnification provision contained in the lease violated the federal Truth-in-Leasing regulations, 49 C.F.R. Part 376; alternatively,

Watson argued that he was not personally liable on the lease. The Court initially entered an order denying in part Jones Express's motion for partial summary judgment, finding that the defendant's liability was limited to $500.00 pursuant to the terms of the lease. Upon Jones Express's motion for reconsideration, however, the Court vacated that order and entered an order instead granting the plaintiff's motion for partial summary judgment on the issue of liability and leaving to be determined the amount of damages. In reaching that conclusion, the Court specifically held that Jones Express was not entitled to recover under a theory of the common-law duty to indemnify, since the parties' relationship was governed by contract. The Court also held that Ernest Watson had entered into the lease in his individual capacity. The matter was set for a bench trial on the issue of damages.

At the trial, conducted on February 16. 2012, upon hearing proof presented by both parties, the Court communicated its inclination to again reconsider the issue of the enforceability of the indemnification provision in the lease and directed the parties to submit briefs addressing new issues raised during the trial, which the parties have now done.

II.     **FINDINGS OF FACT**

Based on the evidence presented by the parties prior to and during the hearing conducted on February 16, 2012, the Court makes the following findings of fact:

A.     **The Lease**

Jones Express is a regulated motor carrier that transports property in interstate commerce under authority of the Department of Transportation ("DOT"). It does so utilizing tractors and driving services leased from owner-operators such as defendant Ernest Watson. On January 30, 2007, defendant Ernest Watson, as lessor/owner, entered into a Long Term Equipment Lease ("Lease") with plaintiff Jones Express as lessee.[1] This Lease is governed by the federal Truth-in-Leasing regulations, 49 C.F.R. Part 376.

The equipment in question was a Volvo truck, serial number 4V4NC9RH61N306252. The only available copy of the Lease is extremely difficult to read, the print on the first page in particular being both minute and blurred. As far as the Court can ascertain, Jones Express, pursuant to the Lease terms,

_____

[1] The Lease is in the record as an exhibit to the complaint (ECF No. 1-1) and as Plaintiff's Trial Exhibit 1.

undertook responsibility for the leased equipment "to the extent required by and in accordance with the provisions of all applicable Interstate Commerce Commission rules and regulations,"[2] for the period of the Lease and while the "equipment" (*i.e.*, the truck) was transporting freight in the service of Jones Express under its federal operating authority. (Lease § 1.)

Under Section 4 of the Lease, Ernest Watson, as "Owner," agreed to pay all the costs of operation, including insurance costs and the first five hundred dollars of any liability claim arising from the negligence of his drivers, as follows:

> OWNER agrees to pay all expenses of his operations under this LEASE including but not limited to expenses of repair and maintenance . . . so as to comply with all applicable regulations of the Interstate Commerce Commission, other regulatory bodies having jurisdiction, or the insurance company carrying the insurance risk on any described vehicle, expenses of fuel, oil, grease, road and other tolls . . . , expenses of drivers, helpers and other employees of OWNER, and taxes of any kind assessed against OWNER.

> OWNER shall obtain at his own expense all license tags, and drivers [illegible] . . . . OWNER shall calculate, acknowledge and file/pay all Highway Use Taxes, fuel taxes, road taxes, or Axle Taxes, quarterly where necessary, unless otherwise indicated by law. If said law requires that the taxes be paid by the COMPANY, OWNER authorizes the COMPANY to deduct any such amounts from any amounts due OWNER.

> Further, OWNER shall pay all costs of operation in addition to the above including but not limited to repairs, fuel taxes, tires, damages to the equipment, payment for injury or damages to the operator, driver and/or helper, insurance coverage for collision, fire, theft, or other occurrence or catastrophe, registration fees, excess empty mileage costs, [illegible] required of or on the equipment or [illegible] the use or operation thereof including all reports connected with such matters, the first five hundred ($500.00) dollars of damage to or loss of cargo or the first five hundred ($500.00) dollars relating to any type of liability claim caused by the fault or negligence of the OWNER and/or driver or helper. OWNER shall pay all fines and penalties arising out of the use of said equipment and ferries . . . .

> It is further understood that, except as hereinafter set forth, in the event the COMPANY is called upon to pay any of the foregoing expenses, fees or other taxes, the amount thereof paid by the COMPANY shall be deducted from amounts due OWNER under this LEASE. . . . As to any insurance programs which may be made available to him, OWNER authorizes the COMPANY to deduct the cost of any such programs from any amounts due OWNER.

(Lease § 4.)

The Lease required Jones Express to maintain public liability insurance in its own name, but placed the responsibility for procuring other types of insurance on Watson:

---

[2] In 1995, the Interstate Commerce Commission transferred the regulation of motor carrier functions to the Department of Transportation and to the Surface Transportation Board. 49 U.S.C. § 13501.

COMPANY will maintain public liability, property damage and cargo insurance, for the protection of the public naming COMPANY as the insured for the vehicles while operating from and to points specified by COMPANY. . . .

All other insurance covering the vehicle or vehicles furnished during the time it or they are operating under this LEASE if any, shall be obtained at OWNER'S expense.

(Lease § 8.)  Appendix "A" to the Lease reflects that Watson elected to purchase non-trucking and unladen liability insurance through Jones Express.  Notably, although the Lease specifies that Jones Express is to procure liability insurance, the Lease does not state a minimal amount of insurance coverage required, nor does it place any express limitations on the amount of the deductible for such insurance.  As discussed below, Jones Express obtained liability insurance from Zurich American Insurance Company ("Zurich").

The Lease also includes an indemnification provision, which states in pertinent part as follows:

Section 9.  **Indemnification.**  In addition to any other indemnification agreements set forth herein, OWNER hereby agrees to indemnify and save COMPANY harmless from any and all cost, expenses or loss caused COMPANY by OWNER, his agents, servants, employees, or leased drivers.  OWNER hereby agrees to assume all risks and to indemnify and save COMPANY harmless from any injury claims made by OWNER'S employees or leased drivers.  It is understood that OWNER assumes all risks of damage or loss to the described vehicles and to all parts, accessories, materials and supplies furnished by OWNER hereunder . . . .

(Lease § 9.)

The Lease further specifies that it is to be construed in accordance with the laws of the Commonwealth of Pennsylvania.  (Lease § 13.)  In addition, both parties to the Lease agreed to be bound by all applicable ICC rules and regulations.  (Lease § 2.)

B.      **The Accident and Resulting Claim**

The parties operated under the Lease or its predecessors without a problem from 2003 through the spring of 2008.  In April 2008, the truck that was the subject of the Lease was dispatched to haul a load in Georgia.  On April 15, 2008, the driver, in the course and scope of the performance of his duties as Watson's employee, was involved in an accident (the "Accident") that resulted in one fatality.  The record reflects that the driver's negligence caused the Accident; he ran a red light and struck a vehicle in an intersection, killing the driver of the other vehicle.  The truck driver was charged with second degree vehicular homicide and failure to obey a traffic control device.

The husband of the woman killed in the Accident pursued a wrongful-death claim (the "Claim")

against Jones Express. The Claim, which never resulted in the filing of a lawsuit, was referred to Zurich. Zurich ultimately settled the Claim for $2,050,000; upon Zurich's payment of that amount to the decedent's husband, the husband executed a comprehensive release that covered Jones Express, the driver, Ernest Watson, and Zurich. (Pl.'s Trial Exh. 10.)

It is undisputed that the insurance policy issued by Zurich (the "Policy" or "Zurich Policy") was procured by Jones Express to satisfy its obligation under the Lease to obtain "public liability. . . insurance, for the protection of the public naming COMPANY as the insured for the vehicles while operating from and to points specified by COMPANY," as set forth above. (Lease § 8.) The Policy was a fleet policy, and Watson's truck was just one of many trucks covered by the Policy. Under that Policy, Jones Express had a "deductible" of $1,000,000. (Pl.'s Trial Exh. 2.) Pursuant to the terms of the Policy, Zurich paid the full amount of the settlement, and Jones Express reimbursed Zurich for the deductible amount, plus, for some unexplained reason, an additional $46,597.56.[3] Jones Express also introduced evidence at trial showing that it incurred approximately $46,278 in attorneys' fees and costs in connection with resolution of the Claim on top of the funds paid to Zurich.[4] In this action, Jones Express seeks to recover from Watson all amounts it paid in settlement of the Claim plus the attorneys' fees and costs incurred in the course of settling the Claim, on the basis of the Indemnification provision in the Lease.[5]

### C.    Hearing Testimony

At the hearing, Kenneth Lacey, vice president of Jones Express and vice president of safety and

---

[3] The record shows that Jones Express reimbursed Zurich by way of two separate checks, one in the amount of $500,000, and the other in the amount of $546,597.56. Jones Express did not offer any evidence or testimony to explain why it reimbursed Zurich for any amount in excess of the $1,000,000 deductible.

[4] Inexplicably, although the original intent of the hearing was to provide Jones Express the opportunity to establish its damages, Jones Express did not present a firm request for a specific amount of damages at trial. Instead it introduced exhibits, verified by Mr. Ken Lacey who testified for Jones Express, in the form of a number of random invoices and checks. In addition to the two checks payable to Zurich, referenced in Footnote 2, Jones Express presented other canceled checks documenting payments related to settlement of the Claim in the total amount of $46,300.38, according to the Court's calculation. The total amount paid by Jones Express, as reflected by the checks, does not precisely correlate with the invoices presented as exhibits along with the checks, nor does it match the amount sought by Jones Express ($46,278), which is stated only in its post-trial brief (ECF No. 85, at 2).

[5] Zurich is not a party or even an interested party in this suit. Jones Express seeks to recover only the amounts it paid out of pocket to Zurich, plus the amounts it paid in attorneys' fees and costs.

risk management for Jones Motor Group, testified on behalf of Jones Express. Mr. Lacey was involved in procuring public liability insurance for Jones Express through Zurich, and testified regarding the million-dollar deductible in the Zurich Policy. He testified that Mr. Watson would not have received a copy of the entire Policy, but that he should have received a certificate of insurance. The certificate would have stated Jones Express's name, the insurer, and the levels of insurance coverage, and named Mr. Watson as the certificate holder. However, the only certificate of insurance introduced at trial (Def.'s Trial Exh. 1) indicated that the coverage provided by the policy it referenced expired in November 2007, some five months prior to the Accident. This certificate references a $1,000 deductible for physical damage to the Volvo truck, but does not state that the underlying liability Policy had a million-dollar deductible. Ernest Watson, who testified at the trial on his own behalf, confirmed that the certificate of insurance introduced at trial was the most recent certificate he had received from Jones Express, and that this particular certificate was in the truck at the time of the Accident.

In response to the question of whether Mr. Watson had been given notice of the million dollar deductible, Mr. Lacey could only respond that, "[i]n the course of his sign-on as an agent, he should have been notified by Ron Williams. . . . Ron Williams was our regional vice president that would have originally struck the deal with Ernest [Watson]." (Trial Tr. 41:19–23.) Mr. Lacey also testified, however, that Mr. Williams is now deceased, and Mr. Lacey himself was not present at those meetings. He stated that he believed Wayne Smith, Mr. Williams' successor, "routinely reminds our agents and contractors about the million dollar deductible that's out there. And we certainly talk about it at driver meetings just to remind everyone what's going on." (Trial Tr. 41:23–42:2.)[6]

Mr. Watson, however, testified that he was never notified that the liability insurance Policy procured by Jones Express carried a million-dollar deductible, either at the time of entering the contract or later. He also averred that he had never received a copy of the entire Zurich Policy, and that the

---

[6] Jones Express indicated at the hearing that, because it believed the hearing would address only the issue of damages, it did not list Wayne Smith as a witness or make him available to testify. Jones Express, in its post-hearing brief, insists that if permitted to do so Mr. Smith would testify that Mr. Watson had notice of the million-dollar deductible prior to the date of the Accident, that Mr. Smith discussed the deductible in meetings attended by Mr. Watson prior to the Accident, and that Mr. Smith reminded Mr. Watson about the deductible in a conversation that occurred immediately after the Accident. (ECF No. 85, at 16.)

certificate of insurance he did receive did not reference any deductible other than the $1,000 deductible on the Volvo tractor. He further testified that he would not have been in business with Jones Express if he had known he could be liable for damages up to a million dollars in the event his truck was involved in an accident. (Trial Tr. 46:19–47:2.)

At the hearing, the Court queried Mr. Lacey regarding whether it was "common in the industry for an owner-operator to separately insure against a deductible that he is obligated to pay you under . . . the agreement . . . to cover expenses." (Trial Tr. 40:20–25.) Mr. Lacey responded that such insurance is probably available on the market, but that Jones Express did not provide it and had no intention of making it available to its independent contractors:

> I know that it happens . . . . I have been approached by numerous brokers, insurance brokers, about selling policies to make available to independent contractors to allow them coverage to pay back to us what they have to pay. We have also steered clear of that because we wanted to insure that the independent contractor had an interest and that they wouldn't operate with some sort of a moral disregard if they had – forgive the term – no skin in the game. But it does happen. If not, I wouldn't be approached by insurance brokers selling the product.

(Trial Tr. 41:4–15.) In other words, Jones Express carried a million-dollar deductible on its liability insurance policy, knowing that Watson and presumably its other independent contractors could be liable up to that amount under the indemnification provision in Jones Express's standard equipment lease, and knowing also that the independent contractors were not separately insured to cover that amount. But Jones Express chose not to disclose that fact to Watson in the Lease or in any other writing.

Mr. Watson testified that he was 69 years old and had been involved in the trucking industry since 1988. Prior to 2003, he was in business for himself and had as many as twelve trucks at one time. In 2003, he began contracting with Jones Express, and continued working as an independent contractor with Jones Express from 2003 through the date of the Accident in 2008. He went into business with Jones Express specifically because he "couldn't afford insurance on 12 pieces of equipment. It was just so high, I couldn't do it." (Trial Tr. 55:2–3.) At the time of the Accident, he only owned two trucks.

Mr. Watson stated that when he first entered into a Lease agreement with Jones Express, he was told: "I could buy from them any type of insurance that I needed. So I took everything they had, everything they had to offer, even including tags and everything." (Trial Tr. 49:13–16.) By taking

"everything" that Jones had to offer, Mr. Watson stated he meant that he had "bobtail insurance,[7] cargo insurance, liability, whatever else" he could obtain through Jones Express. (Trial Tr. 53:23–54:1.) In the course of Watson's relationship with Jones Express, Jones Express deducted the cost of the insurance premiums and other expenses from the amount it owed Watson under the Lease. As a result, Mr. Watson believed there was no reason for him to go out and get additional insurance. (Trial Tr. 54:17–19.) Mr. Lacey likewise confirmed that, among the other expenses covered by Mr. Watson, including the separately purchased insurance, Watson paid a prorated amount to reimburse Jones Express for the cost of the liability insurance premium. (Trial Tr. 29:5–19.) Watson's reimbursement to Jones Express for the cost of the liability insurance was in accordance with the Lease provision specifically stating that Watson would be responsible for the cost of "insurance coverage for collision, fire, theft, or other occurrence or catastrophe." (Lease § 4.)

With respect to the Accident and resulting Claim that gave rise to this lawsuit, Mr. Watson testified that he was aware of the Accident but was not notified about the Claim or the settlement. The record does not indicate when he was first notified about the million-dollar deductible as it applied to the Claim.[8] The parties did not introduce any type of written demand into the record. The Court asked Mr. Watson whether he ever considered obtaining separate insurance to cover anything that was not covered by Jones; Mr. Watson responded, "I really thought that I was 100 percent covered and I had my deductible for each particular thing, and that all that – never even crossed my mind. But I did – when I was in my business, I had a $2 million umbrella, when I had my own business. But with Jones, as big as they were, I figured I was safe." (Transcript 56:19–24.)

---

[7] "Bobtail" or "non-trucking" insurance covers a tractor when the trailer is unloaded and headed home.

[8] In a "Supplemental Filing to Defendant's Response to Plaintiff's Motion for Summary Judgment" (ECF No.35), filed on March 3, 2011 (just after the filing of his response in opposition to the plaintiff's motion for summary judgment (ECF No. 33)), counsel for Watson noted that "informal discovery" had revealed that Jones Express sought to recover $1,000,000 from Mr. Watson "in the form of reimbursement of a deductible." (ECF No. 35, at 1.) Watson asserted at that time that Jones Express had violated the disclosure requirements of the Truth-in-Leasing regulations when it represented to Watson that it had public liability insurance but did not disclose in the Lease that Watson could potentially be liable for up to $1,000,000 in the form of a deductible. The Court apparently overlooked this filing in ruling on the plaintiff's motion for summary judgment, and in any event neither party presented actual evidence of the million-dollar deductible that the Court could have taken into consideration in ruling on the motion for summary judgment.

For its part, Jones Express put forward no evidence to suggest that a million-dollar deductible is common in the industry or that Mr. Watson should have anticipated that Jones Express would choose to self-insure up to that amount and count on Watson to reimburse it for any expenditures for accidents in an amount less than that. Watson's testimony establishes that he reasonably believed, based on the parties' interactions, that he was fully covered. The deductibles of which he was aware were in the range of $500 to $1,000, as is evidenced by the deductible referenced in the certificate of insurance introduced at trial and by the cap on liability referenced in Section 4 of the Lease. The Court has no difficulty in concluding based on the evidence presented at trial that Jones Express's decision to maintain a million-dollar deductible was outside the range of the normal business risks that Ernest Watson could or should have contemplated at the time of executing the Lease.

## III.     LEGAL CONCLUSIONS

The federal Truth-in-Leasing regulations ("the TIL regulations"), 49 C.F.R. Part 376, govern leases between federally regulated motor carriers and independent owner-operators of trucks. These regulations were initially promulgated pursuant to 49 U.S.C. §§ 13301 and 14102. With the Motor Carrier Safety Improvement Act of 1999, Congress transferred to the new Federal Motor Carrier Safety Administration ("FMCSA") all "duties and powers related to motor carriers or motor carrier safety" that were vested in the Secretary of Transportation, including the Secretary's authority over the federal leasing regulations to FMCSA.

Owner-operators such as Ernest Watson are generally small business men and women who own or control truck tractors used to transport property on the country's highways. Owner-operators either transport commodities exempt from DOT regulations or, as independent contractors, lease their equipment and services to registered motor carriers, like Jones Express, who possess the legal operating authority under DOT regulations to enter into contracts with shippers to transport property. Under the TIL regulations, the relationship between independent truck owner-operators and regulated carriers is regulated by the DOT. *See* 49 U.S.C. § 14102 (authorizing the secretary to promulgate regulations governing the leasing of transport vehicles by motor carriers); 49 C.F.R. pt. 376.

Under federal law, motor carriers are required to register with the DOT in order to ship most types of cargo. 49 U.S.C. §§ 13901, 13902. Once registered, common carriers are legally obligated to comply

with certain DOT regulations. 49 U.S.C. § 13902(a)(1); 49 C.F.R. § 367.1. "A primary goal of this regulatory scheme is to prevent large carriers from taking advantage of individual owner-operators due to their weak bargaining position." *Owner-Operator Indep. Drivers Ass'n v. Swift Transp. Co.*, 367 F.3d 1108, 1110 (9th Cir. 2004). In that regard, the Eighth Circuit has noted:

> A review of the development in the Truth in Leasing regulations indicates that they were intended to remedy disparities in bargaining positions between independent owner operators and motor carriers. The regulations were originally developed by the Interstate Commerce Commission (ICC), and the ICC's notice of proposed rulemaking noted "the Commission's deep concern for the problems faced by the owner-operator in making a decent living in his chosen profession."

*Owner-Operator Indep. Drivers Ass'n v. New Prime, Inc.*, 398 F.3d 1067, 1070 (8th Cir. 2003) (citations omitted). Thus, for example, the statute authorizes the DOT to require that all leases between motor carriers and owner-operators be in writing and contain certain basic information, such as the duration of the lease and the compensation to be paid the owner-operator. 49 U.S.C. § 14102(a); *see* 49 C.F.R. § 376.11(a) (requiring that leases be in writing); *id.* § 376.12(b) (requiring that leases "specify the time and date . . . on which the lease begins and ends"); *id.* § 376.12(d) (requiring that the amount to be paid to the owner-operator be "clearly stated on the face of the lease").

In the present case, Mr. Watson does not dispute the reasonableness of the settlement of the underlying Claim resulting from the Accident. Rather, he contests the amount of the damages sought by Jones Express on the basis that he did not have notice of the million-dollar deductible on the Zurich Policy, and that failure to notify him of this deductible violated the Truth-in-Leasing regulations that govern the parties' Lease, 49 C.F.R. Part 376, and violated the covenant of good faith and fair dealing implied in every contract under Pennsylvania law. Watson also argued, in opposition to Jones Express's motion for summary judgment on the issue of liability, that the Lease was ambiguous insofar as the Indemnification provision cannot be read consistently with the Insurance provision and the clause in the Lease which seems to limit Watson's personal liability to "the first five hundred ($500.00) dollars relating to any type of liability claim caused by the fault or negligence of the OWNER and/or driver or helper." (Lease § 4.)

Having previously rejected those arguments and ruled that Mr. Watson was liable to Jones Express for the full amount of the damages sought by Jones Express, based on the language of the Indemnification provision in the Lease, the Court anticipated that the sole issue to be resolved at trial was

the amount of Mr. Watson's liability. The Court reached its holding on the issue of liability, however, without the benefit of a critical piece of evidence: that Jones Express, although technically covered by a liability insurance policy through Zurich, carried a million-dollar per-occurrence deductible on that policy. Based on that new evidence, the Court will (again) reconsider its interpretation of the Lease, and will consider the new arguments raised by Watson at trial.

      **A.**      **Whether the Insurance Provision in the Lease Complied with the TIL Regulations**

Watson argues that 49 C.F.R. § 376.12(j) applies to the issue presented here, and that Jones Express violated the regulation by failing to disclose the deductible amount to Watson in writing.

The referenced regulation states in part: "The lease shall . . . specify who is responsible for providing any other insurance coverage for the operation of the leased equipment, such as bobtail insurance. If the authorized carrier will make a charge back to the lessor for any of this insurance, the lease shall specify the amount which will be charged-back to the lessor." 49 C.F.R. § 376.12(j)(1). In compliance with this section, the Lease states that Mr. Watson as lessor was responsible for providing any other insurance coverage for the operation of the leased equipment, such as bobtail insurance. Subsection (j)(1) also requires that, if the carrier "charged back" to the lessor the cost of any of the insurance, whether the liability insurance or other types, the lease is to specify the amount to be charged back. Kenneth Lacey testified that the cost of both the liability insurance and the other insurance purchased by Mr. Watson was charged back to Mr. Watson, but the Lease does not specify the amount of the charge-back. In that regard, the Lease does not appear to be in compliance with § 376.12(j)(1), but Mr. Watson has not shown that he was damaged by that failure.

Mr. Watson also argues that the million-dollar deductible was a form of charge back the amount of which should have been stated in the Lease. The parties' usage of the term "charge-back" indicates, however, that a charge-back is to cover the monthly cost of maintaining the insurance. The Court finds that million-dollar deductible was not a charge-back, so the failure to include reference to it in the Lease did not violate 49 C.F.R. § 376.12(j)(1) specifically.

Ernest Watson also argues that Jones Express breached 49 C.F.R. § 376.12(f)(2), which states:

> (2) If the lessor purchases any insurance coverage for the operation of the leased equipment from or through the authorized carrier, the lease shall specify that the authorized carrier will provide the lessor with a copy of each policy upon the request

of the lessor. Also, where the lessor purchases such insurance in this manner, the lease shall specify that the authorized carrier will provide the lessor with a certificate of insurance for each such policy. Each certificate of insurance shall include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to the lessor for each type of coverage, and the deductible amount for each type of coverage for which the lessor may be liable.

49 C.F.R. § 376.12(j)(2).

Subsection (j)(2) specifically pertains only to those types of insurance that Mr. Watson, as lessor, purchased through Jones Express. It does not specifically pertain to the liability insurance that Jones Express was required, by the regulation and the Lease, to take out in its own name. Even though Jones Express apparently passed on to Mr. Watson the cost of the liability insurance, Watson did not "purchase" this insurance coverage "through" Jones Express. *Id.* Mr. Watson did purchase bobtail insurance and unladen liability insurance through Jones Express; it is these policies to which subsection (j)(2) pertains. The Lease was apparently not in strict compliance with (j)(2), because it does not spell out Mr. Watson's right to obtain copies of the insurance policies that he purchased through Jones Express or Jones Express's obligation to provide certificates of insurance stating the coverage provided and the deductible on each such policy. However, Mr. Watson has not alleged that he was damaged by that failure, and the record does not reflect whether these other insurance policies were implicated by the Accident.[9] Regardless, subsection (j)(2) did not expressly require that Jones Express provide Ernest Watson with a copy of the Zurich Policy, a certificate of insurance for that policy, or written information about the million-dollar deductible.

However, the Court does find that the Lease was out of compliance with § 376.12(j) for a different reason. The referenced regulation also states, in pertinent part:

Except as provided in the exemptions set forth in Subpart C of this part [which do not apply], the written lease required under § 376.11(a) shall contain the following provisions.
. . .
(j) Insurance.

(1) The lease shall *clearly specify the legal obligation of the authorized carrier to maintain insurance coverage for the protection of the public* pursuant to FMCSA regulations under 49 U.S.C. 13906.

---

[9] The Court notes that it is likely that Mr. Watson owed a deductible after having repairs made to remedy damage to his truck that were incurred in the accident, but the parties did not put on evidence in that regard.

49 C.F.R. § 376.12(j)(1) (emphasis added). The referenced FMSA regulations under 49 U.S.C. § 13906 provide for a minimum level of responsibility of $750,000, thereby requiring either that the motor carrier be insured up to $750,000, or that it present a bond or other security evidencing its ability to pay a judgment up to at least that amount. *See* 49 U.S.C. §§ 13906(a) (providing that a carrier may not be registered for interstate transportation unless it files a bond, insurance policy, or other type of security approved by the Secretary in the minimum statutory or regulatory amount), and 31139(b)(2) (directing the Secretary to prescribe regulations establishing the minimum levels of financial responsibility at no less than $750,000); 49 C.F.R. § 387.9(1) (establishing $750,000 as the minimum level of financial responsibility for for-hire carriage in interstate transport of nonhazardous property).

In this case, the Lease did not "clearly specify" Jones Express's "legal obligation . . . to maintain insurance coverage for the protection of the public pursuant to FMCSA regulations under 49 U.S.C. 13906." 49 C.F.R. § 376.12(j)(1). In the Lease, Jones Express simply agreed that it would "maintain public liability insurance, for the protection of the public naming [Jones Express] as the insured for the vehicles while operating from and to points specified by [Jones Express]." (Lease § 8.) The Lease did not include reference to the regulations governing the parties' relationship, which themselves require insurance coverage in the minimal amount of $750,000. In the absence of insurance up to that amount, Jones Express had to present a bond or other security to the Security to maintain its authority to function as a motor carrier. The Lease did not spell out these obligations, nor did it disclose that Jones Express's insurance policy was completely outside the parameters of the coverage required by the regulations, since it did not provide coverage at all until and unless Jones Express incurred a liability in excess of one million dollars. As a result, the Lease did not "clearly specify" Jones Express's obligation to maintain liability insurance.

This non-disclosure, besides being a technical violation of the regulations, was material, particularly in light of the fact that one of the express goals of the TIL regulations was "to prevent large carriers from taking advantage of individual owner-operators due to their weak bargaining position." *Swift Transp. Co.*, 367 F.3d at 1109; *New Prime, Inc.*, 398 F.3d at 1070. The regulations governing the relationship between motor carriers and independent contracts espouse a goal of insuring that owner-operators such as Watson are informed of all potential costs and liabilities they may incur as a result of

entering into an equipment lease. That Jones Express failed to disclose the million-dollar deductible at the time Watson executed the Lease meant that Mr. Watson was not fully apprised of the possibility that he might be liable to Jones Express up to that amount pursuant to the indemnification provision in the Lease. Thus, the failure either to have insurance coverage for losses up to one million dollars or to disclose that fact in the Lease violated the spirit as well as the letter of the TIL regulations.

> **B.    Whether Jones Express Complied with its Contractual Obligation to Maintain Liability Insurance**

Jones Express maintained the Policy from Zurich with the million-dollar deductible, ostensibly in satisfaction of its obligation under the Lease to "maintain public liability . . . insurance." (Lease § 8.) However, the million-dollar deductible on the Zurich Policy effectively meant that Jones Express was uninsured (or self-insured) for any amount of liability up to one million dollars. If the Accident had been less serious and resulted in a settlement or judgment of less than a million dollars, Jones Express would have been required to pay the entire amount out of pocket, despite its representation in the Lease that it maintained liability insurance for the protection of the public. *Cf. Maxus Exploration Co. v. Moran Bros., Inc.*, 773 S.W.2d 358, 361 n.3 (Tex Ct. App. 1989) ("With regard to the insurance policy, Diamond Shamrock asserts that because it contained a Million Dollar deductible provision this was tantamount to no insurance."). Because the Accident resulted in damages in excess of a million dollars, Jones Express did benefit from the insurance coverage, but nonetheless maintains that Watson is obligated by the indemnification provision to reimburse it for the payment of the million-dollar deductible, plus other expenses related to the Claim.

Jones Express's failure to maintain a reasonable deductible on the liability insurance policy constituted a violation of its obligation under the Lease to maintain insurance. Jones Express may argue that its obligation to maintain insurance was for the "protection of the public," not for the protection of Ernest Watson. The fact remains that Jones Express covenanted in its agreement with Mr. Watson to maintain liability insurance. This representation gave rise to a reasonable expectation on the part of Mr. Watson that the truck was fully covered for liability insurance, and that any accident would require him, at most, to reimburse Jones Express under the indemnification agreement in the amount of a reasonable deductible. Notwithstanding its contractual obligation, Jones Express did not maintain insurance covering

any losses up to one-million dollars. And the only deductibles of which Mr. Watson had been made aware, again, were the $1,000 deductible referenced in the certificate of insurance (for damage to the truck), and the $500 referenced in the Lease itself: "Owner shall pay all costs of operation . . . including but not limited to . . . the first five hundred ($500.00) dollars of damage to or loss of cargo or the first five hundred ($500.00) dollars relating to any type of liability claim caused by the fault or negligence of the Owner, and/or driver or helper." (Lease § 4.)

The failure to maintain insurance for losses up to one-million dollars was compounded by Jones Express's failure to disclose this fact in writing, in the Lease. The failure to disclose the amount of the deductible constituted a material misrepresentation that induced Watson to execute the Lease, and also constituted a breach of the implied covenant of good faith and fair dealing. According to the Restatement (Second) of Contracts, "a person's non-disclosure of a fact known to him is," under limited circumstances, "equivalent to an assertion that the fact does not exist," including "where he knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which that party is making the contract and if non-disclosure of the fact amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing," and "where he knows that disclosure of the fact would correct a mistake of the other party as to the contents or effect of a writing, evidencing or embodying an agreement in whole or in part." Restatement of Contracts (2d) § 161. A non-disclosure that falls within these parameters may make the contract voidable if the disclosure was either fraudulent *or* material, if it induced the recipient to make the contract, and if the recipient was justified in relying on the misrepresentation. *Id.* § 164. For the reasons already set forth herein, the Court has no difficulty concluding that it was commercially unreasonable for Jones Express to assume that Watson would have anticipated the possibility of a loss in excess of a million dollars, or that he would have the financial capacity to cover that type of loss. Jones Express, acting through the deceased Ron Williams, knew or should have known that disclosure of the million-dollar deductible would have corrected Watson's basic assumption that he had full insurance coverage.

Further, Jones Express's failure to disclose the deductible amounted to a failure to act in good faith and in accordance with reasonable standards of fair dealing. *Id.* at § 161. Under Pennsylvania law, which governs construction of the contract, there is a covenant of good-faith and fair dealing implied in

every contract. *Kaplan v. Cablevision of Pa., Inc.*, 671 A.2d 716, 722 (Pa. Super. Ct. 1996) ("Every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement."); *see also Bedrock Stone & Stuff, Inc. v. Mfr. & Trader's Trust Co.*, No. 04-2101, 2005 WL 1279148, at *7 (E.D. Pa. May 25, 2005) (noting that "state and federal courts[ ] have repeatedly stated that every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in the performance and enforcement of the contract"); *Long v. Valley Forge Military Academy Found.*, No. 05-4454, 2008 WL 5157508, at *9 (E.D. Pa. Dec. 8, 2008) (collecting cases standing for this proposition).

The Lease provision requiring Jones Express to procure liability insurance implicitly granted Jones Express a substantial amount of discretion in obtaining such insurance, at least within the parameters of the law. Courts considering the issue of a party's exercise of discretion under a contract have consistently held that such discretion is not "unbridled"; rather, it is "tempered by the implied covenant of good faith and fair dealing and the reasonable expectations of the parties." *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1130 (N.J. 2001). A party exceeds the discretion authorized by the law, and breaches the implied contractual covenant of good faith and fair dealing, "if a party uses its discretion for a reason outside the contemplated range [or] unilaterally use[s] that authority in a way that intentionally subjects the other party to a risk beyond the normal business risks that the parties could have contemplated at the time of contract formation." *Seidenberg v. Summit Bank*, 791 A.2d 1068, 1078 (N.J. Super. Ct. 2002) (citations omitted)); *cf. LaSalle Bank Nat'l Ass'n v. Paramont Props.*, 588 F. Supp. 2d 840, 857 (N.D. Ill. 2008) ("To establish a breach of the duty of good faith and fair dealing, the complaining party must show that the contract vested the opposing party with discretion in performing an obligation under the contract and the opposing party exercised that discretion . . . in a manner inconsistent with the reasonable expectations of the parties." (citations omitted)).

In *Philadelphia Plaza-Phase II v. Bank of Am., N.A.*, No. 3725, 2002 WL 1472337 (Pa. Ct. Com. Pl. Jun. 21, 2002), the plaintiff was found to state a claim for a declaratory judgment that the defendant, Bank of America, was in breach of the covenant of good faith and fair dealing, based on the Bank's attempt to enforce a provision in the parties' Loan Agreement that required the plaintiff (as borrower) to maintain certain expressly identified forms of insurance as well as "[s]uch other insurance as Bank may require." *Id.* at *1. If the plaintiff failed to secure all the insurance required by the Loan Agreement, the

agreement gave the Bank the right to procure the insurance and demand reimbursement from the plaintiff. The plaintiff, pursuant to its obligations, maintained an "all-risk" insurance policy, but the renewal of that policy, issued after the tragedy of September 11, 2001, expressly excluded coverage for terrorism. The Bank advised the plaintiff that the proposed renewal of the policy was unacceptable and demanded that the plaintiff obtain additional terrorism insurance coverage in an amount equal to the full replacement value of the property covered by the loan.

The plaintiff maintained that the Loan Agreement did not give the Bank the right to demand terrorism insurance coverage and asserted that the Bank's actions constituted a breach of the covenant of good faith and fair dealing implied in the covenant. In light of the plaintiff's research that demonstrated that the cost of terrorism insurance was difficult to procure and so prohibitively expensive as to be commercially unreasonable, the court found that the plaintiff stated a claim for breach of the covenant of good faith and fair dealing based on the Bank's allegedly unreasonable exercise of its discretion under the contract to demand that the plaintiff procure terrorism insurance. *Id.* at * 7; *see id.* at * 6 (citing *Burke v. Daughters of the Most Holy Redeemer, Inc.*, 26 A.2d 460, 461 (Pa. 1942), in support of the proposition that the covenant of good faith may be breached when a party exercises discretion authorized in a contract in an unreasonable way).

The facts of *Philadelphia Plaza* differ materially from those presented here only insofar as it is apparent that Jones Express knew at the time the Lease was executed that the insurance policy it would procure or had already procured to cover the fleet had a million-dollar deductible. Jones Express thus incurred the obligation to reveal that information at the time of contract formation, despite the fact that Jones Express's obligation to maintain liability insurance for the protection of the public was not precisely defined except by the federal regulations requiring a minimum of $750,000 in coverage. The Court finds as a factual matter that Jones Express abused the discretion permitted by the Lease in obtaining insurance with a million-dollar deductible and not disclosing that fact to Watson at the time the parties executed the Lease. Further, in light of the regulatory requirements, it is clear that Watson had no reason to anticipate that Jones Express would procure liability insurance with a million-dollar deductible. In short, Jones Express's procurement of a liability insurance policy with a million-dollar deductible constituted an exercise of its "authority [under the Lease] in a way that intentionally subject[ed] [Ernest Watson] to a risk

beyond the normal business risks that the parties could have contemplated at the time of contract formation," *Seidenberg*, 791 A.2d at 1078, and "in a manner inconsistent with the reasonable expectations of the parties." *LaSalle Bank Nat'l Ass'n*, 588 F. Supp. 2d at 857.

Jones Express's proffered evidence regarding alleged subsequent disclosures of the million-dollar deductible are simply not relevant to the Court's analysis. The pertinent question is what information was disclosed to Mr. Watson at the time of the formation of the contract. Later disclosure of a purported million-dollar deductible was not adequate to alter the terms of the contract, because there was obviously no separate consideration exchanged to support the addition of that term. Mr. Watson's alleged later knowledge of or purported acquiescence to that term did not have the effect of waiving his rights under the contract, again because the term was not a bargained-for provision of the contract, and it was a completely hypothetical representation until and unless Jones Express came forward and tried to enforce it, as occurred here. Kenneth Lacey testified that he believed the deductible was something Ron Williams should have discussed with Mr. Watson at the time he entered into the agreement, but Mr. Lacey conceded that he was not present during those conversations and so has no first-hand knowledge of what was discussed. Further, according to Mr. Lacey, Ron Williams is deceased. Ernest Watson testified unequivocally and credibly that he was not informed about the million-dollar deductible at the time he executed the Lease, and that he would not have entered into the agreement if he had been apprised of that information.

### C. Remedies and Construction of the Lease in Light of the Non-Disclosure

In the present case, Mr. Watson has not stated a counterclaim for breach of contract or breach of the covenant of good faith and fair dealing, nor has he sought a declaration to either effect. Instead, he raises defenses to Jones Express's contract claims based on the plaintiff's breach of contract and violation of the TIL regulations. On the basis of these defenses, he asserts that Jones Express is "estopped" from enforcing the indemnification provision in the Lease. The Court previously rejected this argument; now, in possession of a more complete version of the facts, the Court finds it to have merit. The decision to purchase an insurance policy with a million-dollar deductible coupled with the failure to disclose that information in writing at the time of contracting meant, as set forth herein, that (1) Jones Express was in violation of both the letter and the spirit of the TIL regulations; (2) Jones Express

breached an express contract term and breached the implied covenant of good faith and fair dealing; and (3) Jones Express committed a material misrepresentation that induced Mr. Watson to enter into the contract. As a result, Jones Express is estopped from enforcing the Lease indemnification provision beyond the $500 cap expressed in Section 4 of the Lease, as a commercially reasonable deductible amount that was within the contemplation of the four corners of the Lease as an amount Watson might be required to pay out-of-pocket.

IV.    CONCLUSION

In its prior order granting the plaintiff's motion for partial summary judgment, the Court rejected Watson's argument that Jones Express's reliance on the indemnification agreement to support its claim as an "unlawful and hidden insurance obligation" as bordering on the disingenuous. Having heard from the parties, and been apprised further regarding the parties' business practices and the million-dollar deductible, the Court retreats from that position. The Court now agrees with Watson that "[t]o require an owner-operator like Ernest Watson to indemnify Jones Express [in the amount of $1,000,000] here constitutes an unlawful and hidden insurance obligation that violates the letter and the spirit of the Truth-In-Leasing regulations," as well as the Lease itself, and that "[t]o allow Jones Express to pass liability for this loss on to Watson defeats the very purpose of the federal regulations." (ECF No. 32, at 8.)

For the reasons set forth herein, the Court will vacate that portion of its earlier Memorandum and Opinion granting partial summary judgment to Jones Express on the issue of liability on the basis of the indemnification agreement. The Court finds that Jones Express is entitled to judgment in its favor on the issue of liability, but further finds that such liability is limited to the $500 set forth in Section 4 of the Lease.

An appropriate order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge